Our third case is 20-1187 International Brotherhood v. T & H, and we will take a break after this argument. For the appellants, Mr. Johnson, you may proceed. Thank you. May it please the court. My name is Terrence Johnson, and today I'll be arguing on behalf of my client, the International Brotherhood of Electrical Workers, Local 113. The issue in this case stated in its simplest terms is whether employees who are covered by a collective bargaining agreement are entitled to be paid one of two wages that are expressly contained in that agreement when its arbitration clause states that grievances are limited to interpretation or application of express provisions of the CBA. The grievance in this case arose in the summer of T & H Services is the company that was tasked with repairing the hail damage which it assigned its employees to perform. The union filed a grievance with the company stating that the workers should have been paid the roofer's wage contained in the CBA instead of the general maintenance worker's wage. The company refused to arbitrate, so the union filed a that there is no express provision requiring BMWs to be paid roofer's wages when performing roofer's work, but that is absolutely untrue. While there's nothing in the CBA specifically stating those exact words, their right to be paid the proper wage for the work that they perform is contained in multiple express provisions in the CBA. What the company and the district court have both done here is they've described the workers' rights to be paid for the work that they performed in very specific terms, thus disconnecting this right from the previously established right to a fair and proper wage that is enforced by the CBA. What words of the CBA need interpreted? I'm sorry, which words of the CBA need interpreted? Is it roofer? The, well, the, it would be the express provisions that they're relying upon, so. Well, can you point to words, can you point to words in the CBA and say, this is what we're asking be interpreted? Yes, yes, your honor. The, the wage schedule contains the, the classifications for the workers and there's a separate classification for general maintenance workers and there's a separate classification for a roofer. But, but what's to be interpreted? It would be. Are you saying that the arbitrator is going to interpret what roofer means? Or what patching holes on the roof from hail damage means? The arbitrator would interpret whether the roofer or the employees performing that job are entitled to roofer's wages. Additionally, there's specific language, express language in article 28 of the collective bargaining agreement. Article 30 states that. Let me go ahead and ask, you say there's a schedule you're breaking up or are you just waiting for me? I can't, I'll proceed. I was, I was waiting for you, your honor, but there's a schedule that's attached at the end of the collective bargaining agreement. That, that. And it states that. It gives various classifications of workers and what they're to be paid. General maintenance is one, roofer is one. That's correct, your honor. And is that under Davis-Bacon? That's correct, your honor. Well, those are. Okay, so. Bargained for. Okay, so if that's Davis-Bacon. Those are. Those are close classifications are Davis-Bacon classifications. I thought that. They are. Yeah, we're having trouble. Okay. I thought that it's the Department of Labor's responsibility, exclusive responsibility to tell, to determine whether someone is being paid under the proper classification. Am I wrong about that? Yes, your honor. I, I believe that with all due respect, you are the, I believe it's the parties of union and the company who are responsible to set wages under the collective bargaining agreement under the Davis-Bacon Act. The. Go ahead. It refers to collectively bargained wages. The Davis-Bacon Act sets a floor. That workers can't be paid less than, but if they're entitled to be paid more under the collective bargaining agreement, then that is what would be considered the Davis-Bacon wage. So, but it's not the amount of the wage we're talking about. It's the proper classification. There's agreement that if it's classified as roofer, you get paid a certain wage under the contract. If it's classified as general maintenance, you get paid a certain amount under the contract and the Department of Labor has to approve this. There's at least one case out there where the same sort of dispute arose and the union brought a action for, for triple or double the amount owed saying this was incorrectly classified by the, uh, by the contractor and the court said, well, we need to refer that to the DOL, Department of Labor to decide that issue. It seems to me that even if your language might, the arbitration language might apply here. That's, that's not really that clear that when the specific issue is whether the worker is properly classified under Davis-Bacon, that that's traditionally, everything I've seen suggests that's for the Department of Labor to decide, which would certainly suggest it's not for arbitration. Would you respond? Well, your honor, I believe that the contract, but the classification is determined by DOL. Am I wrong? The, the DOL will defer to the collective bargaining agreement. In this case, there's not. In what way, in what way will it defer? It might have deferred to how much can be paid. It will defer to the wage. Right. But that's not what we're talking about. There's no dispute about what the wage is for these specifications. It doesn't defer to the, to the collective bargaining agreement on classification. Does it? How, how the different classifications should be decided? That's correct, your honor. I, but the parties, the, the intent of the agreement is to, under article 30 of the collective bargaining agreement, the agreement when executed shall be deemed to define the wages, hours, rates of pay and conditions of employment. And in order to enforce the terms of this agreement, arbitrator is specifically contracted to determine these disputes. Let me ask you, let me switch a little bit and ask you a question about the terms of this arbitration clause. IBEW has lots of contracts and probably the employer has lots of contracts. Where did this language come from? Was it negotiated specifically for this contract or is this boilerplate that's available? I'd be interested in knowing whether the parties had an understanding of how that arbitration clause had been interpreted in other contracts. I believe it began as boilerplate language when this, when the contract was first negotiated, which was approximately 20 years ago. But the parties have negotiated it every three years and the language is just the same as far as I'm aware. And you know where it came from many years ago with this. Do you know who provided that IBEW clause? I don't know, your honor. Okay, just curious. Well, isn't the Supreme Court made clear there's a separate contract with skilled differential, a specific skilled differential contract that seems to be designed to address this very situation. Why would the parties have negotiated that contract if it was actually covered by the collective bargaining agreement? And in any event, why wouldn't we expect the specific contract to kind of control over the general language that you've been pointing to? Well, the skilled differential increases a company policy that was not negotiated and the collective bargaining agreement takes precedence over any kind of company policy. So, the union is relying on the specific provisions contained in the collective bargaining agreement to determine this dispute. And in M&G Polymers versus Tackett, a Supreme Court case, under the cardinal principle of contract interpretation, the intention of the parties to be gathered from the whole instrument must prevail. And in this case, the intention of the parties is that the proper and fair wage to be paid employees can be ascertained within the four corners of the collective bargaining agreement. When the company refuses to arbitrate the grievance at issue, it's unilaterally dictating terms and conditions of the parties' collectively bargained relationship. Doesn't that bring us back to Judge Hartz's discussion that somebody has to determine what Davis-Bacon work is and that's not something that the arbitrators can do? Well, I believe that it is because the Davis-Bacon Act was specifically incorporated by reference into the collective bargaining agreement in Article 28. So, I believe it would be within the purview of an arbitrator's authority to consider the Davis-Bacon Act. It would be a I believe it would be considered an express provision of the collective bargaining agreement and an arbitrator wouldn't be required to add or subtract or modify the terms of the collective bargaining agreement to determine whether the Davis-Bacon Act has been complied with or even applies. But I believe that there's... Is there a mechanism for doing that? I believe that there probably is, Your Honor, but when the parties negotiated this agreement, the purpose was so disputes could be resolved through the four corners of the document. And it's easy to get entangled in the company's arguments, but the most important tenet to remember is that if there's any dispute whether a grievance is arbitrable, all doubts must be resolved in favor of arbitration. And the courts have expressed a liberal policy favoring arbitration and it requires that they rigorously enforce agreements to arbitrate. And I believe that this collective bargaining agreement... It's a broad arbitration clause and, you know, there's some question about whether it's broad or narrow. This points specifically to the terms of the CBA, so it seems a narrower concept than some of the cases you cited in your brief. What makes this broad rather than narrow? Well, I believe it is a narrow arbitration clause, but nonetheless it requires express provisions and the CBA does have express provisions for determining whether an employee should be able to pay one of two different wages. And in IBEW Local 111 versus Public Service Company, a case before this court, this court stated that a court should send a dispute to arbitration unless it can stay with positive assurance that the arbitration provision is not susceptible to an interpretation that cover this dispute. Thank you for your time. You're welcome. And let's hear from T&H's lawyer, Mr. Fredrickson. Thank you, your honors. Good morning and may it please the court. My name is Todd Fredrickson and I'm appearing on behalf of T&H Services. As you now know, they are the facilities maintenance contractor down at Fort Carson in Colorado Springs. I guess folks in the Springs would say up in Colorado Springs. The contract there is governed by the Service Contract Act and a number of its employees are covered by a collective bargaining agreement with Local 113. The underlying case and this appeal stem from a dispute over work that was performed by general maintenance workers, GMWs, they're commonly referred to. They're laborers at Fort Carson and that work was performed following a hailstorm on June 13, 2018, which damaged a bunch of buildings at the Army base down there. Is the dispute properly characterized as a grievance? Do you acknowledge that? I don't acknowledge that and I've been to Judge Hart's point earlier. Whenever you're talking about whether work should be properly classified as Davis-Bacon work versus work under the Service Contract Act, that's an issue for the Department of Labor. And we've been suggesting to the union all along that they should have gone to the Department of Labor. Judge Hart's also said, you know, could this have been raised in front of the DOL? Absolutely, it could have been. And in fact, the parties have handled these types of step one and the step two process. Did you say, why are you even here? This isn't a grievance. I said it in one of my letters that were exchanged between myself and Mr. Johnson. Mr. Johnson and I see a lot of each other, as you might expect, and we regularly exchange emails and letters and did specifically on this case. And I specifically laid out that we didn't think this dispute was arbitrable. I don't want to talk about arbitrable yet. I want to stay on grievance. And just one more question, which is the reason that you think it's not a grievance, is that because it is not limited to a matter of interpretation or application of the express provisions of the CBA? Is that why you say it's not a grievance? That's correct. That's correct. We have, as Mr. Johnson just admitted, we have a narrow arbitration clause that says that it's grievances and arbitration are limited to matters of interpretation of express provisions of the CBA. And the particular dispute, the particular grievance, as Mr. Johnson referred to it in this case, relates to classifying work performed by general maintenance workers as roofer's work, journeyman roofer's work. That's not addressed anywhere in the collective bargaining agreement as Judge Babcock astutely noted in his underlying decision, granting us summary judgment. This was nothing more than patching holes in a roof with a spackling knife, duct tape to the end of a broom handle. And that type of work is squarely within the job description that's set out in the Service Contract Act. It has a host of job descriptions that are provided, including a particular job description for GMWs. And this work fit right within that classification. Now, the union tends to test on that. Why wouldn't roofing repair be classified as roofer's work? I didn't hear you, Judge Timkovich. They're repairing damage to a roof. Why wouldn't that squarely fall into what a common understanding of work done by a roofer? Because it didn't involve any skilled labor. Roofing work by definition is skilled labor. The definition of a GMW's job description in the SCA specifically excludes the type of activities that were performed here. It gives a good analog, and that is that if you're plastering a ceiling, okay, so the reverse of the roof, right? You're plastering a ceiling, that is unskilled labor, and it's well within the job description of a GMW, not a roofer. It says walls and ceilings, but it doesn't say roofs. That's right. That's why I said it's a fitting analog, because you just flip it, and you're on the roof, and you're patching holes, much like you'd be patching a hole on the inside of a ceiling if it sprung a leak. Mr. Fredrickson, the reason I asked Mr. Bacon to the DOL is because I didn't find any specific authority for that sort of decision making by the DOL. You say, though, that it's been done in the past. Is there some regulation, some guidance, something from the DOL that says we will hear disputes about whether something should be classified a certain way under the Davis-Bacon Act? We will hear disputes between labor and management on that? Yes, your honor, it's contained in the Davis-Bacon regulations themselves. And we cited it in our brief. It didn't seem to say that. Well, if you read 29 CFR section 1.5 and 1.6, there's a discussion of the administrator of the Department of Labor overseeing prevailing wage issues. And then if you look at 1.6B, it's the contracting officer who is charged with the responsibility of figuring out whether work on a particular government site like this one, Fort Carson, is properly classified as purely service contract work or Davis-Bacon work. And so the way that it works in practice is that the contractor and the government's contracting officer work together to figure out whether work should be classified as one or the other. That's why Article 28, which the union relies on, is written the way that it is. And it provides the company with a prerogative to perform Davis-Bacon work. So it is a process of discussion between the particular contract and the government. Unfortunately, I'm not astute enough to read all that into those sections. I'm not saying they're not there, but do you have any authority that talks about the sort of refereeing by the DOL that I had mentioned? If we knew that, then I think one could infer that that was not something that was supposed to be arbitrated. Go ahead. Well, Your Honor, I think it is covered by the regulation. But that aside, you made mention to a case earlier where that very issue had been resolved in favor of sending it up to the Department of Labor. Now, I'm not sure what case you're referring to. Well, it was a little thing. It's probably not what you want. The union could probably get a lot better. I'm not advocating for a quitam action. You can't refer us to any literature. I don't believe that there is a case. Certainly, neither party has cited a case for the proposition one way or the other in their briefs. An article in a trade journal, anything that describes this? Not that I'm aware of. All I can tell you is as a 30-year labor lawyer that commonly Davis-Bacon disputes are resolved with the Department of Labor. Let me ask you a separate question then about the arbitration clause itself that I asked Mr. Johnson. Do you know where this language came from? Do you know how it's been interpreted elsewhere? Your Honor, I think it predates Mr. Johnson and me. It predates our births, but that aside, this is not a typical IBEW contract. You made reference to the fact that the IBEW has hundreds, if not thousands, of contracts across the country. This is a slightly different contract. Most IBEW contracts are between IBEW and an electrical contractor. T&H is something very different than that. They certainly have electricians, but they have other tradespeople as well as a variety of other positions that don't commonly fit within the jurisdiction of the International Brotherhood of Electrical Workers. This clause is not boilerplate. We didn't cite you any other contracts in the record, but it is not because of this particular relationship. The reason I asked if there's anything specific about this is we searched in my chambers for cases that had that language in arbitration contracts, and the great majority of those decisions read those clauses rather broadly and in a way that required arbitration in this case. I think there's really only one solid case in your favor on that among the ones we found, which was seven or eight, I think. I was wondering if you had anything that would lead us in another direction. These are not precedential decisions. They don't bind us as a matter of law, but they might well show what the parties understood this language to mean because this is the way it had been interpreted. Well, what I would say to you, Your Honor, is that as Judge Babcock recognizes, Mr. Johnson recognized himself this morning, the type of clause here is regarded as a narrowly drawn clause. The practical and legal impact of that is that if it is narrowly drawn, and I don't think there's any dispute that it is, then certain things happen. For example, you look to the four corners of the agreement to determine whether the dispute is arbitrable. The difference here is that the union has gone beyond the contract and argued not only Davis-Bacon matters, but also prevailing wage. They even attached to their summary judgment brief the affidavit of a business manager from a completely separate union to suggest that this was roofer's work as opposed to laborer's work. And on top of that, there's this issue of the Service Contract Act and what that definition provides. And last, but certainly not least, the SDI policy that Judge Timkovich referred to a little while ago that you have to look to to resolve the primary dispute between the parties here, which is what mechanism is there to take a general maintenance worker who's making the GMW under the contract up to a journeyman roofer's rate, either under the Davis-Bacon Act or the collective bargaining agreement. And the only source for resolving that, the only mechanism, as Judge Babcock put it, was the SDI policy. And the union's own business manager, by the way, that was the only deposition that we took in this particular case, in the underlying case, admitted two important things. The first one was that there is no provision in the CBA that addresses how you do that. And without my prompting, because I took the deposition, he volunteered that the reason he was reading the issue, the reason why it had come up, was because his members come to him and say, hey, Brian, the company's not SDIing me up. S-D-I-ing me up. That's a reference to the policy. And so that... You just accidentally hit mute. Mr. Frencherson, you're on mute. Thank you. Thank you. I got to quit throwing my hands around. I can't help it. I speak with my hands. But it's because there are collateral matters introduced that render this dispute not arbitrable. That's what Judge Babcock found correctly and fairly. He read all of the briefs. It was clear from his record that he had done that. He relied specifically on the deposition testimony of Mr. Bradley to reach the decision that he did. And we say that he correctly did that because the union itself introduced all of these pieces of information, all these data outside of the CBA. Mr. Johnson, a little while ago, referred to matters of contract construction. What happens when you introduce extrinsic evidence? You don't look at the four corners of the agreement. What if in the case the company had stripped the shingles from the type activity, maybe even clearly Davis-Bacon work? Let's say that happened in this. What would happen there when they're clearly undertaking roofing? I think what would happen there, Your Honor, is that the company would go through an analysis under the SDI policy to figure out what that work was consistent with the descriptions of the jobs in the Service Contract Act. They would also look at whether it is properly Davis-Bacon work as opposed to, you know, sometimes under Davis-Bacon, there's this distinction between simple repair work versus true construction work. And that oftentimes makes a difference in whether you classify it as one or the other. If it's just repair work, more often than not, that is purely covered by the Service Contract Act. So it would have resorted to its own policy. There are steps in the policy. We attach that. It's in the record. I think it's at Appendix 222 that shows the steps that the company goes through. They do it in advance of the work being done for obvious reasons because they've bid the contract. They're confined to charge the rates that are in the contract. Otherwise, it's fraud, waste, and abuse against the government. And so they would have done that here if the scenario you discussed had presented itself, I suspect. These weren't shingled roofs. These are flat roofs on the buildings, largely flat roofs on the buildings down at Fort Carson. And again, as I mentioned before, it was the simple patching of walls that these employees for T&H were doing. All right, Counselor, your time's expired. I think we understand the respective positions. We appreciate your attendance. Case is submitted. You're excused.